Combs v. Stumple.

---

11L  26
16L 592

====================

JOHN G. COMBS et al. v. JOHN W. STUMPLE et al.

CONSTITUTIONAL LAW. Removal of county seats. Under the Constitution of 1870, art. 10, sec. 4, which forbids the seat of justice of any county to be removed without the concurrence of two-thirds of the qualified voters of the county, the removal from the old site to a new place cannot be made except by the required vote, and therefore the act of 1881, ch. 98, which authorizes the removal by a majority of the votes, is unconstitutional.

---

FROM M'NAIRY.

---

Appeal from the Chancery Court at Purdy.   G. W. NIXON, Ch.

McCorry & Bond for complainants.

John L. T. Sneed, J. W. Pace and A. W. Stovall for defendants.

Cooper, J., delivered the opinion of the court.

The Constitution of 1870 contains the following provisions: "When an old county is reduced for the purpose of forming a new one, the seat of justice in said old county shall not be removed without the concurrence of two-thirds of both branches of the Legislature, nor shall the seat of justice of any county be removed without the concurrence of two-thirds of the qualified voters of the county": Const., art 10, sec. 4. The Legislature undertook by the act of 1873, ch. 103, to provide for the removal of county seats, and this act was amended by the act of 1881, ch. 98. The latter act provides that the county court of any county may, a majority of the justices of the county concurring, order an election to be held by the sheriff thereof, to ascertain if the people desire the county seat removed from its present location. After prescribing the mode in which the election shall be ordered and held, the act by sec. 7 provides: "That if two-thirds of the qualified voters of the county have concurred in the removal of the county seat from its location, then the county court shall order an election to be held by the sheriff to ascertain the place the county seat shall be located." At the election to be held for this purpose "each voter shall put on his ballot the name of the place he desires the county seat located at, and the place receiving the majority of votes shall be the

location of the county seat." It further enacted "That the sheriff shall make his returns to the judge or chairman of the county court, and the county court shall proceed to make all necessary provisions for the removal of the county seat, and the erection of the proper and necessary buildings for the courts."

Under this act, the county court of McNairy county, a majority of the justices of the county concurring, on July 4, 1881, ordered an election to be held "for the purpose of ascertaining if the people or the qualified voters of said county desire the county seat removed from its present location." An election was held, and the sheriff made a report of the result to the county court at its October term, 1881. The justices found the number of votes cast for and the number against removal, and declared that more than two-thirds of the qualified voters of said county on that day, and that two-thirds of the legally qualified voters of the county had concurred in the removal of the county seat. The court therefore declared that the seat of justice of said county be removed from the present site to a new site to be afterwards located. And the court ordered an election to be held on November 10, 1881, for the purpose of selecting the new site. This bill was filed November 5, 1881, against the justices of the county to enjoin any further proceedings under the order. The complainants are citizens and tax payers of the county of McNairy. The chancellor, on the final hearing, made the injunction granted upon the filing of the bill perpetual, and the defendants appealed.

The Constitution, by the provisions above cited and other provisions touching the formation of new coun-ties and the change of county lines, has shown a sedulous regard for the rights of property acquired by the location of a county seat, and carefully guarded against a disturbance of those rights unless the pub-lic interest imperatively demanded a change. The county seat cannot be removed in any case without the concurrence of two-thirds of the qualified voters of the county. And it is well settled in this State that the private citizens and tax payers may invoke the aid of the courts to prevent an infraction of these constitutional provisions.

"Nor shall the seat of justice of any county," says the original law, "be removed without the concurrence of two-thirds of the qualified voters of the county." The act of 1881 provides for an election "to ascer-tain if the people desire the county seat removed from its present location." And at the election for this purpose a concurrence of two-thirds of the qualified voters is required. The act then requires another election to be held to determine the place where the county seat is to be located, at which election a ma-jority of the votes shall prevail. In other words, the popular "desire" for a change must be shown by a two-thirds vote, while the actual removal may be determined by a bare majority. But the Constitution says nothing about ascertaining the popular "desire," by an independent vote, to a change in the abstract, and forbids the county seat to be "removed" without the concurrence of two-thirds of the qualified voters.

And it is difficult to conceive how the seat of justice of a county can be "removed" from one place until it has been actually transferred by law to another place. The Constitution manifestly contemplates that the old seat of justice shall continue as originally located until there is an actual removal to another place by the required vote. The desire and the removal, the will and the deed must concur in one and the same election. If it were otherwise, there might be repeated elections before a majority vote could be obtained for any one locality, the people of the county excited and corrupted by the struggles of private interests, and the property owners of the county town kept in a state of protracted uncertainty. A change of the seat of justice ought clearly not to be made unless the public interests unmistakably point to the new locality. The act of the Legislature which allows the removal by a bare majority is clearly unconstitutional.

The chancellor's decree will be affirmed with costs.